Argued and submitted September 10, modified November 10, 1982

In the Matter of the Compensation
of Claude Lyon, Claimant.

LYON,
*Petitioner,*

*v.*

SAIF CORPORATION,
*Respondent.*

(No. 80-03328, CA A23806)

653 P2d 269

Peter W. McSwain, Eugene, argued the cause for petitioner. On the brief were Evohl F. Malagon, and Malagon & Velure, Eugene.

Darrell Bewley, Appellate Counsel, Salem, argued the cause and filed the brief for respondent.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

The issue in this workers' compensation case is the extent of claimant's disability under ORS 656.214(5). The referee found claimant to be 60 percent permanently partially disabled. The Workers' Compensation Board (Board), relying in part on the fact that claimant was about to enter or had just entered a rehabilitation program, reduced the award to 25 percent. Claimant appeals, maintaining *inter alia* that the Board should not have reduced his award through speculation on the outcome of his rehabilitation efforts. We modify the award.

Claimant is in his early 30's. He has a 10th grade formal education and a GED. On October 4, 1974, he was working as a journeyman carpenter when he fell from a ladder and injured his left elbow. A series of determination orders[1] finally resulted in an undisputed award for the scheduled elbow disability.

Claimant also contended that the 1974 injury resulted in a compensable unscheduled psychological disability. By order dated October 19, 1979, the referee concluded that claimant's psychological problems were compensably related to his 1974 industrial injury. SAIF did not appeal that order. The opinion and order did not determine the *extent* of claimant's psychological disability. On April 23, 1980, a determination order awarded claimant "80 degrees for 25 percent unscheduled disability resulting from psychological impairment." Claimant sought administrative review. The referee concluded that, taking into consideration claimant's condition, together with his age, education, training and experience, claimant was entitled to 60 percent permanent partial disability.

SAIF appealed. On review the Board reinstated the 25 percent determination order award, but noted:

"It is difficult if not impossible to assess the effect of claimant's psychological condition on his wage earning capacity because he is now engaged in a retraining program, the purpose of which is to enhance his earning capacity. * * *"

---

[1] Early orders were set aside, because medical developments revealed that claimant's elbow injury was worse than his doctors originally had thought.

Claimant now seeks reinstatment of the 60 percent award.

As we view the case, the first issue is the propriety of the inference, drawn by the referee and accepted by the Board, that claimant actually enrolled in and attended a retraining program at Rogue Community College.

In the summer of 1980, after several years of apparent apathy and despair about his employment future, claimant began to show an interest in a two-year motorcycle repair program offered at Rogue Community College. At the urging of claimant's psychiatrist, Dr. Luther, Comprehensive Rehabilitation Services, Inc. (CRS) evaluated claimant[2] and concluded that he was "motivated to receive training in order to work in the area of * * * motorcycle maintenance." By a letter dated October 3, 1980, the Division notified claimant that it had approved a rehabilitation program that was to have begun on September 29, 1980, and end on June 13, 1982.

The hearing on the extent of claimant's psychological disability was held on September 30, 1980, several days before the date of the letter. At that hearing, claimant testified that he was "trying to get into an educational program" but that his past experiences had made him pessimistic about vocational rehabilitation. SAIF submitted the Division's approval notice after the hearing; the referee admitted it without objection from claimant's counsel. In the opinion and order dated November 28, 1980, the referee, presumably relying on the exhibit and claimant's testimony, stated:

"The inference to be drawn from the record, which I draw, is that claimant is presently attending the authorized program of rehabilitation. * * * Claimant is presently enrolled in Rogue Community College * * *."

As noted above, the Board relied heavily on this inference to justify its rejection of the 60 percent disability award and its reinstatement of the 25 percent award.

■ The exhibit is the only thing in the record to indicate that claimant may have enrolled in and attended the Rogue Community College program. Claimant argues

---

[2] An earlier CRS evaluation had concluded that claimant was not physically and emotionally ready for rehabilitation.

that, because there is nothing else in the record to show his participation in the program, the Board improperly speculated about its effect on his earning capacity. We think the fairest inference from the record is that claimant probably enrolled as he was authorized to do. However, a finding that claimant *enrolled* is a far cry from assuming claimant *successfully completed* the program.

This brings us to the second question in this case: Was it proper for the Board to base its rejection of the 60 percent award on claimant's participation in an uncompleted rehabilitation program? This court and the Oregon Supreme Court have both held that the Board cannot base decisions regarding permanent total disability

> "* * * upon a speculative future change in employment status. * * * [W]hether [a] claimant is permanently totally disabled must be decided upon conditions existing *at the time of decision,* and his award of compensation * * * can be reduced only upon a specific finding that the claimant *presently* is able to perform a gainful and suitable occupation." *Gettman v. SAIF,* 289 Or 609, 614, 616 P2d 473 (1980). (Emphasis supplied.)

*See also Lohr v. SAIF,* 48 Or App 979, 618 P2d 468 (1980); *Leedy v. Knox,* 34 Or App 911, 581 P2d 530 (1978).

■ ■ The three cases cited above are permanent *total* disability cases, but we believe their reasoning applies equally to permanent *partial* disability cases. In *Gettman,* the court based its holding on the language of the ORS 656.206 definition of "permanent total disability." Because that definition is phrased in the present tense ("a suitable occupation *is* one which * * * the worker *is* able to perform after rehabilitation" [emphasis supplied]), the court concluded that the Board could not properly speculate about future changes in employment status that *might* result from vocational rehabilitation. The statute governing determination of unscheduled permanent partial disability is also in the present tense:

> "* * * the criteria for rating of disability shall be the permanent loss of earning capacity due to the compensable injury. Earning capacity is the ability to obtain and hold gainful employment in the broad field of general occupations, taking into consideration such factors as age, education, training, skills and work experience. * * *" ORS 656.214(5).

In other words, disability rests on how employable the claimant is at the time of the disability determination, rather than on how employable the claimant will be after all feasible retraining has been completed.[3] It was improper, at least on this record, for the Board to reduce claimant's disability award on the basis of his enrollment in a program that the record does not show he had completed.

■     We turn now to the question of the extent of claimant's disability. He concedes that he had "some" psychological problems before the 1974 accident. SAIF contends that "a substantial part of [claimant's] problems pre-existed his injury." Neither party explains what claimant's pre-injury problems were, and the record contains very little additional information.

Dr. Luther, claimant's treating psychiatrist, described a childhood unstable enough to produce early psychological problems, but he never discussed such problems directly. He did, however, imply pre-injury problems in a June, 1979, letter in which he stated that claimant's psychiatric problem "has definitely *worsened* as a result of his injury of October, 1974." (Emphasis supplied.) A second examiner, Dr. Duvall, stated:

> "Mr. Lyon does in my considered opinion, have psychological problems which predate this industrial injury. An individual does not usually develop these kinds of problems solely as the result of an injury and subsequent disability. * * * Probably the clearest way to view Mr. Lyon's kind of adaptation is to see it as the result of preexisting psychopathology interacting with subsequent stress following his injury and disability.

> "* * * [M]y judgment [is] that his response to the injury was to a significant degree determined by his preexisting psychopathology."

Finally, Dr. Gardner, who interviewed and tested claimant once, said:

> "I believe [claimant's] personality disorders preceded the industrial injury. * * * He seems to feel somebody

---

[3] Of course, in both permanent total and permanent partial disability cases the Board may reconsider and adjust its award if vocational rehabilitation has lessened the claimant's disability. ORS 656.268(5); ORS 656.278.

should take care of him or * * * solve his problems for him. This adaptation to life preceded his injuries. Thus, it is my professional opinion that his present personality disorder had nothing to do with his industrial injury."

No one explains the types of disorders or problems that supposedly preceded the injury. Some explanation of them would have helped in our evaluation of the various experts' strikingly different explanations of the cause or causes of claimant's present condition.

On the other hand, the record contains a number of indications that, before claimant's injury, his marriage was good, he enjoyed his work, he excelled in athletics and he engaged in a number of outdoor activities. The pre-injury picture that emerges is one of a healthy, active, satisfactorily employed and happily married man. We therefore agree with the referee's statement in his October 19, 1979, order:

"No doubt claimant had underlying psychological problems, but there is nothing in this record to suggest that those problems were active prior to the injury. * * *"

Thus, the psychological problems noted *after* the injury signify a decline from claimant's pre-injury condition.

Claimant was not treated for psychological problems until October, 1978, four years after his accident. Before that, the only reference in the record to claimant's state of mind was the observation of his treating physician, Dr. Lynch, that claimant was "well motivated and would make a good candidate for retraining." Psychological problems must have appeared by the fall of 1978, however, because claimant's attorney then referred him to Dr. Luther for psychiatric evaluation. Thereafter, a variety of psychiatrists, psychologists and other physicians had occasion to observe and comment on claimant's psychological problems.

The most notable thing about the psychiatric evaluations is that each person who examined claimant between October, 1978, and the time of the hearing in September, 1980, concluded that, at the very least, he was "depressed." Frequently the language was stronger. Dr. Luther stated at different times that claimant was "psychiatrically disabled" or "essentially totally disabled" and that his depression

was "significant and chronic." Consulting physician Dr. Yospe said that he was "severely depressed" and "overwhelmed by his somatic and emotional problems." Other examiners noted "overwhelming psychological problems," "a moderate to severe range of depression," a "downward spiral of depression of helplessness," an "overwhelming pathology." and a "depression [that] would interfere with his involvement in rehabilitation."

In addition to the doctors' conclusions about claimant's disability, CRS had found in 1979 that claimant was "not capable of holding a job, given his present psychiatric condition," and could not "benefit from rehabilitation services" until his "medical and psychiatric difficulties have stabilized."

Such unanimity of opinion indicates that claimant, at the time of the 1980 hearing, was indeed in poor psychological shape and that his problems placed significant limitations on his earning capacity.[4] Even though the last CRS evaluation, made in September, 1980, concluded that claimant was "motivated to secure retraining," the record supports the referee's conclusion that claimant's "depressed neurosis * * * adversely affects his ability to return to the employment market. * * *"

■ In summary, claimant is a man in his early 30's with a 10th grade education and a GED. At the time of his injury, he had spent seven years as a carpenter. As a result of that injury, he can no longer work as a carpenter. He has "few transferrable skills," and he has psychological problems that flow from the 1974 injury. In our opinion, these factors significantly handicap claimant's "ability to obtain and hold gainful employment in the broad field of general occupations." He is more disabled than the Board's award suggests.

---

[4] A number of the reports attribute claimant's depression, in part, to his marital problems and to his ·use of depressants and alcohol. Some of these observations relate to the *causal relationship* between claimant's injury and depression, a question that was settled by the October 19, 1979, order; they do not relate to the *extent* of his depression. Several examiners and CRS also noted claimant's lack of motivation, and one or two opined that he was receiving "considerable secondary gain." We do not believe that these observations speak to the extent of claimant's disability, because his lack of motivation seemed to be a sub-part of his overall depression.

On the other hand, claimant is still fairly strong and healthy despite his accident.[5] He is of average intelligence and young. Both CRS and Dr. Luther believed at the time of the hearing that he was motivated to proceed with retraining—the motivation itself being an improvement in his condition. These factors indicate to us that the referee's 60 percent award is too high.

On *de novo* review, we modify the Board's award to 50 percent permanent partial disability.

---

[5] Doctors' reports consistently described claimant as "well-muscled." Apart from his left arm and shoulder disability, the reports indicate that claimant is physically sound.